Judge Blackford’s
dissenting opinion is as follows :
I dissent from the judgment of the court in this case.
The claimant demands of the United States the amount of 43 loan-office certificates, of 400 dollars each, dated the 23d day of December, 1777, with the interest on the same.
These certificates are each in the following form :
“ 400 dollars.
“ The United States of America acknowledge the receipt of four hundred dollars from Thomas Stone, which they promise to pay to said Thomas Stone or bearer, on the first day of December, one thousand seven hundred and eighty-one, with interest annually at the rate of six per cent, per annum, agreeable to a resolution of the United States passed the 22d day of February, 1777.
“Witness my hand this twenty-third day of December, anno Domini one thousand seven hundred and seventy-seven.
“SAM. HILLEQAS.
“ Countersigned : By order of J. A. Treutlin, esq., governor of Georgia.
“E. DAYIES, Jr.”
On twenty-nine of these certificates there is the following indorsement: “Four years’ interest to December 23, 1781, paid in bills of exchange.
“ M. HILLEGAS, GW. Treas’:
The claimant relies alone upon these certificates as his cause of action. He stands just as the holder of a promissory note does, who sues upon the note alone, and the defendant denies the validity of the note. In that case there is but one question to try, and that is, whether or not the instrument is a valid cause of action against the defendant.
A loan-office certificate, to bo a valid claim against the United States, must have, been issued according to law. The first resolution of Congress authorizing the issue of such certificates was passed on the 3d of October, 1776, and is as follows :
“ Resolved, That five millions of continental dollars be immediately borrowed for the use of the United States, at the annual interest of four per cent, per annum; that the faith of the United States be pledged to the lenders for the payment of the sums to be borrowed, *362 and the interest arising thereon, and that certificates be given to the lenders, in the form following, viz :
“The United States of America acknowledge the receipt of-dollars from--, which they promise to pay to the said- -or bearer, on the-day of-, with interest annually at the rate of four per cent, per annum, agreeable to a resolution of the United States passed the 3d day of October, 1776. Witness the hand of the Treasurer, this-day of--, A. D.-.
“ Countersigned by the commissioners of one of the loan-offices hereafter mentioned.
“ That for the convenience of the lenders, a loan-office be established in each of the United States, and a commissioner, to superintend such office, be appointed by the said States respectively, which are to be responsible for the faithful discharge of their duty jn the said offices.
“ That the business of the said commissioners shall be to deliver certificates for all such sums of money as shall be brought into their respective offices agreeable to these resolutions, which certificates shall be indented, and the checks kept in the said office ; to keep books, in which regular entries shall be made of the sums borrowed, and the time when, and the names of the persons by whom, the said sums were lent; to transmit to the continental treasurer, once a month, an account of the cash in their respective offices, and to answer all drafts of the treasurer to the amount of the cash which they shall, at any time, have in their hands as aforesaid.
“ That the Treasurer of the United States shall send to the respective loan-offices such a number of certificates and of such denominations as shall be ordered by the commissioners of the treasury.
“That no certificate be issued for a less sum than three hundred dollars.
“ That the several sums of money to be borrowed shall be repaid at the office where the same was lent, at the expiration of three years, and that the annual interest shall likewise be paid at the said office.
“ That the said commissioners of the respective loan offices be entitled to receive of the United States one-eighth per cent, on all moneys which shall be brought into their respective loan offices, in lieu of all claims and demands that they may have for transacting the business of the said office.” (1 vol. Journals of Congress, pp. 505, 506.)
The next resolution of Congress on the subject was passed on the 15th of November, 1776, and is as follows :
*363 “ Resolved, That the certificates be of the following denominations :
'737 of $1,000 ......................... $737,000
1, 470 of 600 ......................... 882, 000
2,205 of 500 ......................... 1,102,500
2, 940 of 400 ......................... 1, 176, 000
3, 675 of 300 ......................... 1,102, 500.” •
(1 vol. Journals of Congress, p. 549.)
On the 15th of January, 1777, the following resolution of Congress was passed :
“Resolved, That the continental treasurer be empowered and directed to borrow money on the loan-office certificates; that they be countersigned by the auditor general for the time being, and that, in transacting this business, he govern himself by the rules prescribed to the commissioners of the other loan offices, and have for his trouble the same allowance.” (2 vol. Journals of Congress, p. 14.)
The other resolutions of Congress necessary to be noticed were passed on the 22d of February, 1777, and are as follows :
“Resolved, That thirteen millions of dollars be borrowed on loan-office certificates, of the following denominations :
2,500 of 200 dollars each.......................... $500,000
9,185 of 300 dollars each.......................... 2,755,500
7,350 of 400 dollars each.......................... 2,940,000
5,513 of 500 dollars each.......................... 2,756,500
3,675 of 600 dollars each...........;.............. 2,205,000
1,843 of 1,000 dollars each.......................... 1,843,000
13,000,000
“Resolved, That all certificates issuing after the first emission be signed by Michael Hillegas, esq., treasurer, or Samuel Hillegas, and countersigned, agreeable to the resolutions of Congress on the 3d of October, 1776, and 15th of January, 1777.” (2 vol. Journals of Congress, p. 48.)
It appears that the forty-three certificates now sued on were signed by Samuel Hillegas, in pursuance of the last above-named resolution of the 22d of February, 1777, and were sent with others to the loan office in Georgia, to be countersigned by the loan-office commissioner there, and to be by him issued for such loans as might be there obtained.
It is clear that the certificates so sent to Georgia were of no validity while they remained without being countersigned by the loan- *364 office commissioner there, and issued by him. The certificates were just as invalid without the signature of the loan-office commissioner as they would have been without the signature of Michael or Samuel Hillegas; because the signature of the loan office commissioner, as well as that of one of the other persons named, was expressly required by the aforesaid resolutions of Congress of October, 1776, and of February, 1777.
The claimant relies alone, as I have said, upon the certificates as his cause of action. He must, therefore, prove the certificates to be valid, and to do that he must, as already observed, show them to be countersigned by the loan office commissioner for Georgia. But the claimant has failed to show that fact. The certificates show, upon their face, that they are not so countersigned. After the signature of Sam. Hillegas, the following words are written:
“ Countersigned : By order of J. A. Treutlin, governor of Georgia.
“E. DAVIES, Jr.”
Mr. Davies shows, by that language, that, in countersigning the certificates, he acted, not as a United States loan-office commissioner for Georgia, in pursuance of the resolution of Congress, but merely as an individual, in pursuance of an order of the governor of Georgia. Suppose Davies had been indicted for usurping the office of loan office commissioner for Georgia, would his signature to said writing prove that he had acted as such loan-office commissioner? Certainly not. A loan-office commissioner was an agent of the United States. Now did Davies, in signing said writing, act as an agent of the United States ? The writing plainly shows that he did not so act, because it shows that he acted by order of the governor of a State. There is not the slightest evidence that Davies was a loan-office commissioner. He did not pretend to be'such commissioner. He merely signed his name, "E. Davies, jr.,” and says he did so by order of the governor. The resolution of Congress required the loan-office commissioner to be appointed by the State of Georgia, not by the governor of the State. Where is the statute of Georgia authorizing the governor to appoint a loan-office commissioner? Where is the proof that the governor attempted to make such appointment ? In short, where is the proof that Davies pretended to act as a loan-office commissioner ? In the absence of all such proof, how can it be said that Davies was a United States loan-office commissioner for Georgia, and that he countersigned and issued these certificates as such commissioner? It is very certain that I cannot say so. Believing, therefore, as I do, that these certificates are not countersigned by the loan-office commissioner for Georgia, *365 I must consider them, so far as the United States are concerned, as absolutely void.
I have been speaking, thus far, of the certificates in question as, <per se, a cause of action against the United States. I readily agree, that if the United States received value from any person for the certificates, they would be liable to such person for that value. But such liability would arise, independently of the certificates, from an implied contract. That subject, however, requires no further notice, because there is not a particle of evidence that the United States ever received the least benefit- for the certificates. There is some evidence to show that Georgia received a benefit from the certificates; and if she did, it is that State, and not the United States, that is accountable for such benefit.
It is contended that the indorsement by the Treasurer on twenty-nine of the certificates, for four years’ interest having been paid, proves that the certificates were regularly countersigned and issued. I am entirely of a different opinion. If the certificates were void when put in circulation, for want of the commissioner’s signature, the Treasurer had no authority to make them valid by paying interest on them, or by any other act of his. Congress required the certificates to be countersigned by the proper loan-office commissioner, and the Treasurer could only recognise as valid the certificates which were so countersigned. If he paid the principal of any other certificates, or interest on them, his act would be wrongful, and he would be individually liable to the United States for the money so paid. Suppose the certificates were forgeries, would the Treasurer’s payment of interest on them make the United States liable for their payment 1 Certainly not; and the reason is, that he had no authority so to bind his government. The law is the same in the case before us. It may be, that if an individual should indorse a receipt of interest on a forged note purporting to be his, a subsequent assignee, without notice, might recover on the note; but the present is a different ease. The Treasurer was only an agent of the United States, and could only bind his principal by acts authorized by law; and no one will pretend that the law authorized him to pay interest on loan-office certificates which were void. I conclude, therefore, that the Treasurer’s payment of interest on the certificates does not affect the question as to their validity.
In August, 1790, Congress passed an act authorizing the holders of loan-office certificates to have them funded. (1 Stat. at Large, 138.) Accordingly, in September, 1791, these 43 certificates were presented at the treasury by one McEvers, for Le Roy & Bayard, of Philadelphia, and were rejected. The evidence of this rejection is among the *366 papers in the cause. At the time of such rejection, but a few years had passed from the time the certificates had been countersigned by Davies. It would seem that if Davies had been a loan-office commissioner, the holders of the certificates would have then obtained evidence of that fact. No such evidence was produced, and the presumption from that circumstance is very strong that the certificates had been countersigned, as they purported on their face to be, without any authority from the United States. In the next year, 1792, the Secretary of the Treasury, Mr. Hamilton, to whom similar certificates countersigned by Davies were referred, reported against their validity.
In support of my opinion, that these certificates are not binding on the United States, and ought not to be paid by them, I have the opinions of the Treasury Department of the government, officially given at various times, during a period of more than sixty years. Those opinions of the department I shall now proceed to state.
In March, 1792, the Secretary of the Treasury, Alexander Hamilton, made a report to Congress against the validity of certificates like those now in question. That report is as follows:
“ The resolutions of the United States in Congress assembled, which respect the issuing of the certificates commonly called loan-office certificates, make it necessary that they should be previously countersigned by certain officers denominated commissioners of loans, who were to be appointed under the authority of the particular States.
“After diligent inquiry within the State of Georgia, no evidence has been obtained either of the appointment of E. Davies (the person by whom the certificates in question were countersigned) to the office of commissioner of loans for that State, or that he was ever known or reputed to have acted in that capacity. • The reverse, of this, indeed, appears from various communications to the treasury, copies and extracts of which are contained iri the schedule herewith transmitted. It is to he remarked, that E. Davies does not even style himself commissioner of loans; but instead of this, adds to his signature the words: ‘ By order of J. A. Treutlin, governor of Georgia.’
“The certificates, however, are signed by the proper officer, and all such as have appeared arc genuine; and interest, as alleged in the petition, has been paid upon them by the late Treasurer of the United States, as in other cases. A number of those certificates have been offered to the present commissioner of loans for the State of Georgia, to be subscribed pursuant to the act making provision for the debt of the United States, and upon a reference to the treasury by that officer have been directed to be refused.
*367 “The reasons for this direction are substantially as follows:
“The certificates in question having been irregularly issued, and without the requisites prescribed by the acts of Congress, were, of course, in the first instance, not obligatory upon the United States.
“The subsequent payment of interest upon them by an executive officer without the sanction of any order or resolution of Congress could not confer validity upon a claim originally destitute of it, though it might occasion hardship to individuals who, upon the credit of that payment, may have been induced to become possessors of those certificates for valuable consideration.
“ There are examples of the payment of interest, by the mistakes of public officers, upon counterfeit and forged certificates. It seems to be clear that such payments cannot render valid or obligatory certificates of that description; and yet a similar hardship to those which have been mentioned would attend those who may have afterwards become possessed of them for valuable consideration; nor does there occur any distinction between the effect of such payment in the one and in the other ease.
“ Between individuals, the payment of interest by an agent, upon the presumed but not real obligation of his principal, either through mistake or otherwise, without special authority of the principal, could certainly give no new validity to such an obligation; and the same rules of right govern cases between the public and individuals.
“ These considerations were deemed conclusive against the admission of those certificates, under the powers vested in the officers of the treasury. It remains for the legislature to decide how far these are considerations strong enough to induce a special interposition in their favor. In making this decision, the following circumstances will, it is presumed, appear to deserve attention:
“ The present is not a case of mere informality; there is no evidence that the certificates were issued for any purpose of the United States. The contrary, indeed, is stated to be the fact.
“Their amount is not positively ascertained; no account of the issues having ever been rendered, though there is no appearance of any considerable sums being afloat.” (American State Papers, title Claims, p. 464.)
In a report from the Secretary of the Treasury, made in 1795, as to inadmissible claims, the certificates now in question are noticed as follows:
“Class 6. — The claims of this class are founded on certificates commonly called loan-office certificates, signed ‘ Samuel Hillegas,’ and *368 countersigned, ‘By order of J. A. Treutlin, esq., governor of Georgia. E. Davies.’ These certificates form part of a sum of 200,000 dollars, which was sent from the treasury on the 24th September, 1777, to Georgia, under the care of a Captain Cosmo Medici, and intended for the loan officers there, who were at that time, and long after, William O’Brien and Nehemiah Wade. E.-Davies was never recognized or known as an officer of the United States; on the contrary, it appears, from such information as could be collected, that he was only a temporary agent for the State, employed to purchase a quantity of Indian goods, and that to enable him to effect this object a sum was placed in his hands, in certificates, which by an order of council he was authorized to issue. These probably were the certificates now under-consideration; and it is therefore presumable that the State of Georgia has had the benefit of them.
■ “ For remarks, more in detail, on the subject of these certificates, reference is prayed to a report of the Secretary of the Treasury, dated the 28th day of March, 1792, on the petition of William Smith; a copy of said report being filed with said claims. ” (American State Papers, title Claims, pp. 173, 174.)
In 1816, Mr. A. J. Dallas, Secretary of the Treasury, in answer to the chairman of a committee of the House of Representatives, wrote as follows:
“Treasury Department, January 9, 1816.
“ Sir : In answer to the inquiries contained in your letter of the 4th inst., relating to certain loan-office certificates belonging to John Delafield, and referred to in his petition, a copy of which was enclosed in your letter, I have the honor to state :
“ 1. That the certificates (if they are of the description supposed, as they are not sufficiently designated to render it certain) were not regularly issued from any loan office of the United States.
“ 2. The interest for four years was paid on a part of them by Michael Hillegas, formerly Treasurer of the United States.
“3. No certificates belonging, as far as appears from any papers accompanying them, to John Delafield, are in the treasury. Forty-three certificates, corresponding in amount with those referred to in his petition, and which were presented at the treasury on the 18th of April, 1794, by Uriah Tracy, in behalf of Benjamin Tallmadge, are now in the Auditor’s office, and are supposed to be the certificates in question.
“ 4. There are four other certificates, of the nominal amount of 400 *369 dollars each, of the same description, and presented in behalf of other persons, also remaining in the Auditor’s office.
“ 5. The objections against funding the certificates are stated in the report of the Secretary of the Treasury, of the 28th of March, 1792, on the petition of William Smith, of which a copy is enclosed.
“I will only add, that this subject has been repeatedly before Congress, and that no provision has hitherto been made for the payment, in any way, of the certificates issued under the circumstances of those in question.
“ I have the honor to be, very respectfully, sir, your most obedient servant,
“ A. ,T. DALLAS.
“Hon. Benjamin Tallmage,
“ Chairman of a Committee, fyc., House of Representatives.
(American State Papers, title Claims, pp. 45o-’6.)
The following report of the Register of the Treasury was*transmitted to the Senate by the acting Secretary of the Treasury, in February, 1852 :
“ Treasury Department,
“Register’s Office, February 5, 1852.
“Sir : Upon the claim of Nahum Ward, referred to the Secretary of the Treasury by a resolution of the Senate, February 24,1846, and by the Secretary to the Register of the Treasury, March 2, 1846, If have the honor to submit the following report:
“ The papers in this case were first submitted to the Register on the 3d day of February, 1852, which will account for the difference in the date of the reference and the report.
“ This claim has now been before the Treasury Department and Congress for more than sixty years, and in that time has undergone very thorough investigation, having been the subject of reports by Alexander Hamilton and Oliver Wolcott, Secretaries of the Treasury— one made in 1792, and the other in 1795; and also of sundry reports, favorable and adverse, by both houses of Congress. At this late day it is therefore scarcely to be expected that any new light can be thrown upon the subject by any records or documents existing in this office, everything relating to it having been heretofore furnished.
“ It is admitted that the claimant is in possession of forty-three loan-office certificates of four hundred dollars each, dated 23d December, 1777, payable to Thomas Stone, or bearer, and signed by Samuel Hillegas, and countersigned ‘ By order of J. A. Treutlin, governor of *370 Georgia. E. Davies. ’ They were payable on the 1st day of December, 1781, with interest at six per cent.
“ It is not denied that the signature of Samuel Hillegas is genuine, and that he had authority to sign the certificates on behalf of the United States; but it is denied that E. Davies had any authority to countersign the certificates, he not having been appointed commissioner of loans for Georgia,' and the resolution of Congress of October 3, 1776, under which they were issued, requiring them to bo countersigned by the commissioner or commissioners of loans for the State to which they were sent to be issued; that if he thus countersigned them as he states, ‘ By order of J. A. Treutlin, governor of Georgia, ’ and .they were issued for the benefit of the State of Georgia, then they constitute a claim against the State of Georgia, and not against the United States.
“ It is admitted that the certificates in question are a part of a lot whicli were sent to Georgia early in the year 1777, and which were all previously signed by the proper officer of the treasury.
“ The first intimation we have of these certificates is, that they were, on the 24th of September, 1791, offered at the treasury, for the purpose of being funded, by Mr. James McEvers, for Leroy & Bayard, merchants, of Philadelphia, and then rejected on the ground of not having been regularly issued — not having been countersigned, in accordance with the resolution of Congress, by the loan officer or loan officers of Georgia.
“At the session of Congress which followed, the subject was brought before that body by the petition of William Smith, of Baltimore, the possessor of loan-office certificates of the same character, who prayed Congress to order their payment. The subject was referred to a committee, and the Secretary of the Treasury, being called on, made a report, which is hereto annexed, and to which reference is desired. The committee, adopting his report as their own, came to the conclusion that the prayer of the petitioner ought not to be granted.
“ In classifying the various claims against the United States, Oliver Wolcott, Secretary of the Treasury, made a report upon these claims, which were placed in class number six. His report is also annexed.
“ It does not appear how these certificates came into the possession of Leroy & Bayard, nor where they had been from the time they were issued by E. Davies until presented at the treasury in September, 1791.
“ It surely must have been in the power of Leroy & Bayard to have shown who they received them from, and to have traced -them back to the first person or persons to whom they wore issued. This was not *371 attempted, and we are left in the dark as to the reason of their negligence.
“ It is alleged that the certificates were placed in the hands of E. Davies by Governor Troutlin, with directions to him to countersign them, for the purpose of paying Captain Robert Farquhar for certain goods which the said Davies and Thomas Stone, to whom they were made payable, had by order of the governor and council of Georgia purchased of him.
“ It is now well substantiated that these men (Davies and Stone) were ordered to purchase the goods of Farquhar, and did make the purchase, the whole amounting to ¿663,605, or ¿67,586 10i. Id. sterling money; but it also appears from a pamphlet found among the papers, entitled ‘ Report of the commissioners on the petition of Peter Trezevant, Milledgeville, 1842,’ that these goods were never paid for by Davies and Stone, or either of them, and that if Davies received these certificates from Governor Troutlin for that purpose, he committed a breach of trust, and used them for some other purpose. It appears from this pamphlet, which is the republication of the proceedings of the legislature of Georgia upon a claim made against the State by the legal representatives of the said Robert Farquhar for the amount of the goods sold to Davies and Stone, that the legislature admitted the justness of the claim, and at one time ordered its payment; that auditor’s certificates were authorized to be issued and were issued to Peter Trezevant, who married the heir-at-law of the said Farquhar, for the above amount of ¿67,5S6 10í. Id.; but it also appears that these certificates had not been paid by Georgia as' late as 1840.
“ From the most deliberate examination of the subject I have been able to give it, the conclusion is forced upon my mind, that instead of using the certificates intrusted to them by Governor Treutlin, if they were so intrusted, for the purpose of paying for the goods they had purchased of Farquhar, by the order of the governor and council, Davies and Stone must have used them for their own purposes, and most likely sent them to Leroy & Bayard, of Philadelphia, with whom it is not improbable they had dealings.
“ In one of the letters from Savannah which accompanies the report of Secretary Hamilton on this subject, that of Mr. Steick, it is stated that Davies kept both the goods purchased of Farquhar and the certificates.
“From the time when, in 1792, the committee of Congress and the Secretary of the Treasury made adverse reports, no movement seems *372 to have been made by the holders of these certificates down to the year 1816, a period of twenty-four years. During all this time the decisions and reports made upon them were acquiesced in. In the mean time the forty-three certificates first heard of in the possession of Leroy & Bayard had passed into the hands of Diehard Platt, of New York, who was the treasurer of the Ohio company, and upon whose failure, it appears, these certificates, with other property, passed to the said company in part payment of what was due from their treasurer.
“ It further appears that they came into the possession of Col. Benjamin Tallmadge, as treasurer of said company, who, on the 5th of March, 1815, transferred them to John Delafield. This transfer, it seems, was not intended to change the ownership of the certificates, Mr. Delafield being a stockholder in said company, whose property they still remained. The transfer may be accounted for from the fact that Mr. Tallmadge was a member of the Congress which commenced its session on the first Monday of the following December; that to this Congress John Delafield petitioned for relief in the premises, and that Mr. Tallmadge had become chairman of the committee to whom his petition was referred.
“ As chairman of that committee, he at the first session made a favorable report, which not having been acted on by the House, the same petition was presented at the next session, referred to the same committee, and another favorable report made by the same chairman, which met a like fate with the former.
“ The inquiry is here forced upon us, why it was that after these certificates were rejected at the treasury in September, 1791, on the ground that Davies had no authority to countersign them, the owners, Leroy and Bayard, or those into whose hands they subsequently passed, did not take some steps to show that he (Davies) had at least countersigned them by order of Governor Treutlin, and that they had been used for the benefit of the United States. Nothing of the kind appears to have been attempted until 1816, twenty-five years after, when Governor Treutlin and others, who must have been able to speak with some degree of confidence upon the subject, had gone down to the tomb or forgotten the circumstances.
“ The Secretary of the Treasury was not, however, thus negligent, but was diligent in obtaining all the information upon the subject which could be collected, the result of which he has stated in his report hereto annexed.
*373 “It is presumable that after the rejection of these certificates at the treasury in 1791, and the reports made against them'by the Secretary of the Treasury and the committee of Congress, the certificates could not have been estimated very highly. This idea is strengthened by a resolution adopted at a meeting of the Ohio company at Philadelphia, 10th May, 1792, which is in the following words :
‘ It is further resolved, That it be entirely in the discretion of the treasurer to sell or retain the loan-office certificates countersigned E. Davies as he shall think most conducive to the interests of the company : provided always, that the sale of the said certificates shall be made on such conditions as not to subject the company to refund the proceeds of such sale, if the certificates shall not prove obligatory on the United States.
‘BENJAMIN TALLMADGE, Clerk:
“ But all this aside, the question arises, are the United States legally or morally bound to pay these certificates 1 I can find nothing in. this office, nor among the papers presented by the claimant, to give it a complexion different from what it wore when it was reported upon by the Secretary of the Treasury in 1792 ; by Mr. Little in the House, March 3, 1826; by Mr. Shepley in the Senate, January 6, 1836 ; and by Mr. Jarnagin in the Senate, January 29, 1844.
“ I have the honor to be, sir, your obedient servant,
“ N. SAEGENT, Register.
‘‘Hon. Thos. Corwin, Secretary of the Treasury.”
I here close my opinion respecting this claim. The judgment of the majority of the court is in favor of the claimant for the sum of sixty thousand eight hundred and seventy-six dollars and ninety-nine cents. A careful examination of the 'facts and law of the case has satisfied me that the claimant has no right to recover.